UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
DARRYL LAYTON,

                         Petitioner,                      **MEMORANDUM OF DECISION AND ORDER**

    -v.-                                            04 Civ. 4032 (DRH)

WILLIAM PHILLIPS, Warden of Greenhaven
Correctional Facility, and GLENN S. GOORD,
Commissioner of New York Department of
Corrections

                         Respondents.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**Appearances:**

**For the Petitioner:**
Ten Broeck Law Offices
3117 W. Lawrence Ave.
Chicago, Illinois 60625
By: James C. Ten Broeck Jr., Esq.

**For the Respondent:**
Suffolk County District Attorney's Office
Criminal Courts Building
200 Center Drive
Riverhead, New York 11901
By: Guy Arcidiacono, Esq.

**HURLEY, District Judge:**

### *Introduction*

       Darryl Layton ("Petitioner") petitions for a writ of habeas corpus, pursuant to 28 U.S.C. §

2254, from his December 18, 1998, conviction of Robbery in the Second Degree. William

Phillips, Warden of Greenhaven Correctional Facility, and Glenn S. Goord, Commissioner of

New York State Department of Corrections ("Respondents") have moved to dismiss or deny the

petition. Petitioner opposes the motion. For the following reasons, Respondents' motion is granted and the writ is denied.

### *Factual Background*

The following facts are derived from the instant petition and the underlying record.

On December 15, 1997, at about 5:20 p.m., Doreen Vici ("victim" or "witness") was returning to her car in the parking lot outside of her place of work. It was dark and the parking lot was not well-lit. As she approached her car, she was confronted by a man who threatened her with what appeared to be a gun (it was later determined that the weapon was a BB-gun), demanded and took her money and jewelry, then stole her car, along with the personal possessions that were inside.

When the police arrived at the scene, at about 6:15 p.m., the victim described the robber to police as a black male, approximately six foot, with a thin build, wearing a dark jacket. She also stated that she had seen the perpetrator come from a van that was still at the location. Police searched the van and found a box of twenty-six photographs in frames. Those twenty-six photographs depicted women and children. Two other, unframed photographs were found in the glove compartment. Both of those photographs depict what appears to be the same black male.

The victim was then taken by police to the precinct, where the detective took her written statement and presented her with the photographs recovered from the van. Viewing State Exhibit 26A, (*see* Pet.'s Appellant Br., App. at 7), which is apparently a picture of Petitioner from a much earlier time when he had a very different appearance, the victim did not identify the photographed person as the perpetrator. She did identify the person depicted in 26B as her assailant. (*See id.* at 8.)

The van that had been identified by the victim was registered in California to a woman named Marjette Branche. This information, along with a telephone number recovered from within the van, provided the local address for Ms. Branche. The victim's vehicle was recovered approximately a quarter mile from Ms. Branche's local address. At approximately 12:30 a.m. on December 16, 1997, police found Petitioner at the home of Ms. Branche. He agreed to go with the police to the precinct, where he arrived around 1:30 a.m. At approximately 4:30 a.m., eleven hours after the incident, the victim was presented with two line-ups of black males. Both line-ups consisted of the same individuals in different orders. The individuals were similar in appearance to the photograph identified by the victim but not similar to the description given at the scene by the victim. Both times the victim identified Petitioner as the perpetrator.

### *Procedural Background*

Petitioner was charged with Robbery in the First Degree and Robbery in the Second Degree in a two count indictment. Prior to trial the state court held a *Wade* hearing to determine the propriety of the three identification procedures (the photographic identification and the two subsequent line-up identifications). The state court analyzed the photographic identification as a show-up and concluded that it was the only alternative available under the circumstances. Additionally, the court concluded that there was nothing improper or suggestive to support suppressing the line-up identifications. (Pet. Appellant Br., App. at 4.)

Petitioner was convicted by a jury on both counts of the indictment. He was sentenced on April 15, 1999 as a second felony offender to a determinate term of 23 years on the Robbery in the First Degree Count and to a concurrent determinate term of 13 years on the Robbery in the Second Degree.

Petitioner appealed his convictions to the Appellate Division, Second Department.  On direct appeal he argued that (1) the in-court identification testimony should have been suppressed because of a highly suggestive display of photographs; (2) the victim and a Detective were allowed to bolster the victim's identification; (3) the verdict was against the weight of the evidence; (4) the prosecution's closing was improper; (5) the trial court improperly disqualified prospective jurors; and (6) there were other errors which demonstrated unfairness.

Petitioner also moved before the trial court, pursuant to § 440 of the New York Criminal Procedure Law, for an Order vacating the judgment of conviction and ordering a new trial.  In support, petitioner claimed two *Brady* violations, to wit, the prosecutor's failure (1) to turn over the telephone number of the victim's cellular telephone that was stolen during the robbery, and (2) to notify defense counsel of a lawsuit brought by the victim against the defendant.

The trial court denied the CPL § 440 motion.  With respect to the telephone number, the court found that contention without merit as the "telephone was inoperable on the day of the robbery, and even if it had been operable, it would require pure speculation to conclude the true robber had necessarily retained the telephone for his own use."  The state court then addressed the assertion that the prosecution was aware that the complaining witness had commenced a lawsuit against the Petitioner prior to testifying in the criminal trial, but failed to disclose that information.

> The prosecution has submitted an affidavit indicating that the defendant was aware of this civil suit prior to sentencing in this case, more than two years before the present motion was made. The prosecution correctly argues that this aspect of defendant's motion was not made with the due diligence required by law. Moreover, civil suits against alleged perpetrators and third parties who might also bear civil responsibility are not at all unheard of

under these circumstances. Given New York's requirement that a civil case is commenced by filing a copy of the complaint with the Clerk of Court and the purchase [of] an index number, this civil action was a matter of public record which counsel for the defendant could have found out about for himself if he had been so inclined.

Trial counsel's decision not to cross-examine the victim about whether she had commenced a civil suit can not be attributed to lack of knowledge on his part that such a suit had been commenced. All defense counsel had to so to find out about the lawsuit, even if he had not searched the public records, was to ask the complaining witness about the topic on cross-examination. Since neither was not done [sic], it follows that the decision not to pursue the issue of a lawsuit, either actual or potential, was a matter of defense trial strategy and quite independent of any action or inaction on the part of the District Attorney.

There was substantial evidence in this case that the victim was working at Home Depot; that she had taken a work break and gone to her car; that her car was forcibly stolen from her; and that the car was later recovered at location distant from the Home Depot and near to where the defendant was then residing.

Trial counsel no doubt knew that it could hardly be disputed that this robbery had, in fact, occurred and there is nothing about a civil suit against the defendant, who by all ostensible evidence is not a man of substantial means, that would have impugned her identification of him specifically as the perpetrator.

The failure of the District Attorney to advise counsel for the defendant that the complainant had commenced a civil action could not possibly have changed the verdict in this case.

On appeal from the conviction, the Supreme Court of New York, Appellate Division, Second Department by Order dated February 3, 2003, modified the judgment. It vacated the Robbery in the First Degree conviction and the sentence therefor, holding that Petitioner had established his affirmative defense that the gun used in the robbery was a BB gun. The Appellate Division found Petitioner's "remaining contentions [to be] without merit." By separate Order also dated February 3, 2003, the Appellate Division affirmed the trial court's denial of the CPL § 440 motion. Petitioner sought to reargue the February 3, 2003 Orders of the Appellate Division

but that application was denied by Decision and Order dated June 23, 2003. The Court of Appeals denied leave to appeal from the Appellate Division orders.

Petitioner filed this petition for a writ of habeas corpus on September 27, 2004. Petitioner seeks the writ on the following grounds: (1) the prosecution withheld crucial evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) the methods used to identify Petitioner were illegally suggestive; (3) the prosecution's summation was improper; (4) the court illegally dismissed potential jurors.

### Discussion

### I.  Habeas Standard

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides a narrow scope of habeas review by federal courts of state convictions. 28 U.S.C. § 2254(d). Under the AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1), (2).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellam v. Kuhlman,* 261 F.3d 303. 313 (2d Cir. 2001) (quoting *Aycox v. Lytle,* 196 F.3d 1174, 1178 (10th Cir. 1999)). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" a Supreme Court case, or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme

Court] and nevertheless arrives at a result different from [their] precedent." *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (citing *Williams v. Taylor*, 529 U.S. 362 (2000)). In making this determination, the court looks "only to the holdings of the Supreme Court, as opposed to its dicta, and to the Supreme Court's holdings as of the time of the relevant state court decision . . . ." *Jiminez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006). A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* The Supreme Court has made clear that "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 529 U.S. at 409. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). Objectively unreasonable is different from clear error. *See Lockeyer v. Andrade*, 538 U.S. 63, 75 (2003). As the Second Circuit has explained: "while some increment of incorrectness beyond error is required . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton,* 295 F.3d 270, 278 (2d Cir. 2002). Determinations of factual issues made by a state court "shall be presumed to be correct" and the applicant "shall

have the burden of rebutting the presumption of correctness by clear and convincing evidence."

28 U.S.C. §2254(e)(1); *see McKinney v. Artuz,* 326 F.3d 87, 101 (2d Cir. 2003).

Respondents argue that no *Brady* violation occurred and that the identification procedures did not deny petitioner his federal constitutional rights. Respondents further argue that the remaining claims are unpreserved and, in any event, do not support habeas relief. (*See* Resps.' Mem. at 3.) Petitioner disputes these arguments. The Court discusses each in turn.

## II.    *Brady* Claims

Under *Brady* and its progeny, "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006) (Raggi, J.) (citations and quotation marks omitted). "To establish a *Brady* violation, a defendant must show (1) that the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the 'evidence must have been suppressed by the State, either willfully or inadvertently'; and (3) 'prejudice must have ensued.'" *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)); *see also United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (citing *Giglio*, 405 U.S. at 154)). Favorable evidence is only material where there is a "reasonable probability" that the outcome of the case would have been different had the evidence been disclosed. *United States v. Bagley*, 472 U.S. 667, 682 (1985). A reasonable probability arises "where the government suppresses evidence that 'could reasonably [have been] taken to put the whole case in such a different light as to undermine

-8-

confidence in the verdict.'" *Coppa*, 267 F.3d at 140 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995) (alterations in original)). On a habeas petition, the question for the court is whether, without the evidence, the petitioner still received a fair trial. *See Kyles*, 514 U.S. at 434. For example, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972). However, "[e]vidence is not suppressed if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Disimone v. Phillips*, 461 F.3d 181, 192 (2d Cir. 2006).

Attention will no be focused on Petitioner's two, previously identified *Brady* claims.

## A.  The Civil Lawsuit

On December 7, 1998, the victim signed a complaint alleging several causes of action relating to the December 15, 1997 robbery and seeking $3,000,000 in damages from Petitioner and the other named defendants.[1] The victim commenced the action in New York State Supreme Court, Suffolk County on December 10, 1998,[2] which date was also the first day of Petitioner's trial. The victim testified at that trial and the trial ended on December 18, 1998 when the jury returned a guilty verdict.

---

[1] Also named as defendants in the lawsuit were the owner of the premises where the victim was attacked and Pinkerton Security Services, which allegedly was under contract to provide security for the premises.

[2] The Court takes judicial notice of the records of the Suffolk County Clerk's Office which evidence that the action was filed on said date. Under New York law an action is commenced by the filing of the summons and complaint in the County Clerk's Office. *See* N.Y. C.P.L.R. 304.

The record does not reveal when the Petitioner was served with the summons and complaint in the civil suit. However, it is clear that the Petitioner was served by mail at the Suffolk County Corrections Center on February 16, 1999 with the answer of one of the co-defendants. Thus, prior to his April 15, 1999 sentencing, Petitioner was aware of the victim's lawsuit. It was not until March 13, 2001, however, that counsel for Petitioner received a copy of the victim's January 17, 2001 deposition in the civil lawsuit. At that deposition the victim testified as follows:

> Q: Prior to initiating the lawsuit, did you discuss it with anyone outside the attorneys?
> A: Family and my real estate attorney.
> Q: Did you at any point discuss with the district attorney the filing of a civil lawsuit?
> A: I mentioned it to him. Yes.
> Q: Do you recall when you mentioned it to the DA?
> A: No.
> Q: Was it prior to testifying at trail?
> A: Yes.

Petitioner first complained of the prosecution's failure to disclose knowledge of the victim's civil lawsuit in a motion, dated August 25, 2001, to vacate his conviction pursuant to N.Y. Crim. Pro. Law § 440.

Within the Second Circuit, "[e]vidence is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or *should have known*, of the essential facts permitting him to take advantage of that evidence." *United States v. Gonzalez*, 110 F.3d 936, 944 (2d Cir. 1997) (emphasis added) (internal quotation marks omitted); *see also Paulino*, 445 F.3d at 224; *accord United States v. Jackson*, 345 F.3d at 73 (recognizing "an exception" to *Brady*'s disclosure obligation "where the defendant or his attorney either knew,

or should have known, of the essential facts permitting him to take advantage of that evidence")

(internal quotation marks omitted). "Documents that are part of the public record are not deemed

suppressed if defense counsel should have known of them and fails to obtain them because of a

lack of diligence in his own investigation." *United States v. Payne*, 63 F.3d 1200,1208 (2d Cir.

1995) (citing *United States v. Bermudez,* 526 F.2d 89 (2d Cir. 1975)).

Petitioner's *Brady* argument with regard to the victim's civil lawsuit must fail for one

simple reason: The state court found that the civil suit, inter alia, was a matter of public record

and defense counsel should have known of the suit. That factual finding is "presumed to be

correct." 28 U.S.C. §2254(e)(1). Petitioner has not submitted clear and convincing evidence to

rebut the presumption of correctness. *See* 28 U.S.C. §2254(e)(1).

Under New York law an action is commenced by the filing of the summons and

complaint. *See* CPLR 304. The suit was filed prior to the victim's testimony and defense

counsel could have discovered its commencement by searching the County Clerk's records. The

prosecution is obligated to disclose relevant evidence, but the prosecution is not duty-bound to

point out relevant evidence that should be known by the defense. The question is whether the

government "suppressed" evidence. *Paulino*, 445 F.3d at 224. One cannot reasonably describe

evidence as "suppressed" when it is part of the public record. *See United States v. Infanti*, 404

F.3d 376, 386-87 (5th Cir. 2005) (rejecting *Brady* claim based on prosecution's failure to

disclose that co-conspirator had filed a motion requesting a psychiatric examination where

request for examination was part of the public record); *United States v. Willis,* 277 F.3d 1026,

1034 (8th Cir. 2002) ("Publicly available information which defendant could have discovered

through reasonable diligence cannot be the basis for a *Brady* violation.")

Moreover, to warrant the relief requested prejudice must be established. Petitioner must establish that "there is a reasonable probability that the result of the trial would have been different if the suppressed [information] had been disclosed to the defense." *Strickler*, 527 U.S. at 289. "The adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Here, the state court found that, even if the civil action should have been disclosed, "[t]he failure of the District Attorney to advise counsel . . . that the complainant had commenced a civil action could not possibly have changed the verdict in this case." The state court's conclusion is not contrary to or an unreasonable application of federal law.

Petitioner's *Brady* claim regarding the failure to disclose the pending civil lawsuit provides no basis for granting his habeas petition.

**B. The Failure to Disclose the Cellular Telephone Number Did Not Violate *Brady***

Petitioner also argues that the prosecution's failure to turn over the telephone number to the victim's cellular telephone, which was taken by her assailant, was a *Brady* violation. (*See* Pet.'s Opp. Mem. at 13.) Petitioner insists that "[i]t is clear that had the telephone been used after the robbery at certain times, and at certain places, which can be determined with cellular telephone technology, it would have been exculpatory because it would show that Petitioner was not the assailant." (*Id.* at 15.) Respondents point to the trial court's finding that the phone was no longer in service at the time of the robbery, and its further ruling that the exculpatory value of the telephone records would require "pure speculation to conclude that the true robber had retained the telephone for his own use." (*See* Resps.' Mem. at 12.) Petitioner retorts that the trial

court's factual finding is not entitled to deference because it was "based upon an unreasonable determination of facts in light of the evidence presented in the state court proceeding" as there were no telephone company records presented but only an affidavit by the prosecutor that the investigation revealed that the telephone was not in service on the date of the car jacking.

As set forth above, federal courts must grant deference to state court factual determinations. *See* 28 U.S.C. § 2254(e)(1). Petitioner is required to show that the state court's factual determination was objectively unreasonable. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Objective unreasonableness is not merely an incorrect or erroneous decision. *Williams v. Taylor,* 529 U.S. 362, 410 (2000); *Ward v. Sternes,* 334 F.3d 696, 703-04 (7th Cir. 2003) ("[A] challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error. Instead, [one] must further establish that the state court committed unreasonable error.") "[W]hether a state court's decision was unreasonable must be assessed in light of the record the court had before it." *Holland v. Jackson,* 524 U.S. 650, 652 (2004). Moreover, because the determination of factual issues by state courts are presumed to be correct, *see* 28 U.S.C. § 2254(e)(1), to prevail under section 2254(d)(2) a habeas petitioner must disprove the factual finding by clear and convincing evidence and demonstrate that the state court's factual determination was objectively unreasonable. *See Miller-El*, 537 U.S. at 341.

Here, the only information presented to the trial court was that the victim's cellular telephone was not in service on the date of the car jacking and that there was no longer a telephone number assigned to the phone. The record does not reveal that any evidence was presented to the trial court which contradicted or impugned the prosecution's averment. The

absence of any telephone company records before the state court is not particularly significant.
One would not necessarily expect records to exist for a phone that a telephone company is not
servicing. Thus, this Court cannot find that the trial court's determination was "unreasonable"
"in light of the evidence presented" and must accord that factual finding deference in view of
Petitioner's failure to sustain his burden of submitting clear and convincing evidence otherwise.

In addition, Petitioner's argument that any phone calls that were made on the cellular
telephone after it was stolen would have exculpatory value is flawed. Even if, arguendo, the
telephone was in service, the trial court's finding that only rank speculation supported the notion
that the perpetrator retained the phone and made calls certainly seems reasonable and, in any
event, petitioner has failed to establish that it was objectively unreasonable. Accordingly, the
prosecution's failure to disclose the cellular telephone number does not provide a basis for
habeas relief.

### III. The Identification Procedure Was Not Impermissibly Suggestive

In *United States v. Wade*, the Supreme Court recognized that there is a "grave potential
for prejudice, intentional or not, in the pretrial lineup, which may not be capable of
reconstruction at trial," 388 U.S. 218, 236 (1966), and that to protect a defendant's Sixth
Amendment rights the trial court must ascertain prior to trial whether a witness's identification
testimony is tainted by an improperly made identification.

In order to determine if identification evidence is appropriate, a sequential inquiry is
required.

> The court must first determine whether the pretrial procedures
> unduly and unnecessarily suggested that the defendant was the
> perpetrator. . . . If the procedures were not suggestive, the

-14-

> identification evidence presents no due process obstacle to admissibility . . .; no further inquiry by the court is required and the reliability of properly admitted eyewitness identification, like credibility of the other parts of the prosecution's case is a matter for the jury. . . .  If the court finds, however, that the procedures were suggestive, it must then determine whether the identification was nonetheless independently reliable. . . .  In sum, the identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability.

*Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001)(internal citations and quotations omitted); *see Jackson v. Fogg,* 589 F.2d 108, 111 (2d Cir. 1978).

As to the first element, "[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." *United States v. Wade*, 388 U.S. 218, 228 (1967).  Suggestive identification procedures "increase the likelihood of misidentification," and "[i]t is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. at 198; *see generally Simmons v. United States*, 390 U.S. 377, 384 (1968) (right to due process includes the right not to be the object of suggestive police identification procedures that create "a very substantial likelihood of irreparable misidentification"); *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967) (examining whether procedure was "so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process of law"); *Raheem*, 257 F.3d at 134; *Wray v. Johnson*, 202 F.3d 515, 524 (2d Cir. 2000); *United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990).

It is only when the procedure is unduly and unnecessarily suggestive that the court must then determine whether the witness's identification of the defendant has independent reliability. To do so, the court looks generally to the factors set out in *Neil v. Biggers*, taking into account "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness'[s] prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation." *Neil*, 409 U.S. at 199-200; *Manson v. Brathwaite,* 432 U.S. 98, 114 (1977); *Raheem*, 257 F.3d at 135. A good or poor rating with respect to any one of these factors will generally not be dispositive, *see, e.g., United States v. Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992), and in each case, the question of independent reliability must be assessed in light of the totality of the circumstances, *see, e.g., Neil*, 409 U.S. at 199. The Court applies this analysis to both the photographs shown to the victim and the line-up.

A.      **Photo "Show-Up"**

Petitioner first argues that the photographs presented to the victim impermissibly suggested that Petitioner was the perpetrator. The trial court found that the photo array was not suggestive because it was analogous to a "show-up" procedure required by the "exigency" of the situation. (*See* Trial Court Order, dated Sept. 4, 1998, at 1.) On appeal, the Appellate Division did not discuss the identification specifically, simply stating that Petitioner's "remaining contentions are without merit." (*See* Appellate Division Order, dated Feb. 3, 2003.) This passing reference is adequate to qualify as an adjudication on the merits of Petitioner's arguments because "[a] state court decision need not mention a particular argument or explain the reasons for rejecting it." *Dallio v. Spitzer*, 343 F.3d 553, 560 (2d Cir. 2003) (collecting cases); *see also*

*Francolino v. Kuhlman*, 365 F.3d 137, 141 (2d Cir. 2004); *Brown v. Artuz*, 283 F.3d 492, 498 (2d Cir. 2002) (holding that a claim was adjudicated on the merits where it was one of the remaining contentions that the Appellate Division stated were without merit).

Petitioner argues that the trial court incorrectly applied federal law concerning "show-ups," when the Petitioner's case "should be controlled by those cases which concern[] whether the display of photographs was suggestive or not." (Pet.'s Opp. Mem. at 18.) In other words, Petitioner maintains that the trial court erred in analyzing the photographic display as akin to a "show-up" rather than as a photographic line-up. Petitioner's argument lacks merit.

A "show-up" or the practice of showing suspects to a victim solely for the purpose of identification and not as part of a line-up, has been widely condemned. *See Briscoe v. Phillips,* 376 F. Supp. 2d 306, 312 (E.D.N.Y. 2005) (citations omitted). The Supreme Court has held that an identification procedure is suggestive when it "in effect . . . says to the witness '*This* is the man.'" *Foster v. California,* 394 U.S. 440, 443 (1969). "However, 'even suggestive out-of-court identification will be admissible if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'" *United States v. Mohammed,* 27 F.3d 815, 821 (2d Cir. 1994) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir. 1991).

In the present case, the victim told the police that she had seen her perpetrator leaving a van in the parking lot.[3] The police searched the van and located the photographs in question.

---

[3] Specifically, in the sworn statement given on the date of the incident, the victim stated, in part, as follows:

> As I was getting to my vehicle I saw a tan van parked next to my car. I saw someone sitting in the driver's seat. I hurried to my car and put the key in the driver's door. While I was doing that I heard the van door open, and I heard someone come around from the van, and come up behind me. I was sitting in the car and as I was

These photographs were then shown to the victim and she identified the perpetrator as the individual photographed in Exhibit 26B. This procedure was unlike a typical "photographic array." In a typical array, the witness is provided a set of photographs of individuals who fit the witness's description of the perpetrator. *Cf. U.S. v. Thai*, 29 F.3d 785, 808 (2d Cir. 1994). Here, the majority of the photographs shown to the victim were of children and females that did not match the description of the perpetrator. Only two of the photographs depicted an adult black male. It was as if the victim were shown two men and asked if either was the perpetrator. Consequently, the trial court's analysis of the photographic display as a "show-up" rather than a "photographic line-up" was not unreasonable.

Petitioner also maintains that the trial court's ruling that the photographic array was required by the "exigency" of the situation was erroneous. Petitioner points to no Supreme Court precedent, however, to support his argument. Furthermore, the trial court's determination that "the photographic identification was a necessary precursor to a corporeal identification" was reasonable, as "no such alternative was available." (*See* Trial Court Order at 3.) The photographs recovered were snapshots in civilian attire. As the trial court noted, "Casual snapshots of people, let alone a collection of snapshots of people with an appearance similar to the male depicted in the recovered photograph, are not the stock and trade of law enforcement." (*See* Trial Court Order at 3.)

In this case, as Respondents aptly note, the police were looking for leads to try to focus the investigation. In showing the victim the photos from the van, the police were not trying to

_____

closing the door a hand reached into the car with a gun.

-18-

rule someone in or out. "[H]ere the police had no idea who the photographs depicted, or whether they had anything at all to do with the case. They merely showed the victim all of the photographs trying to begin their investigation. As the trial court correctly pointed out, given that the crime had occurred a short time earlier, the exigencies of the circumstances cried out for a prompt viewing of these photographs to determine if they had any relationship whatsoever to the crime." (Resps.' Mem. at 16.)

Given these circumstances, it was not unreasonable for the state court to conclude that "[a]rrest photos all would have been too distinctive compared to the recovered photo to provide a valid array." (*See id.*). The manner of the display was not "so unnecessarily suggestive and conducive to irreparable mistaken identification that [Petitioner] was denied due process of law." *Stovall*, 388 U.S. at 301-02; c*f. Thai*, 29 F.3d at 808 ("In reviewing challenges to pretrial identification procedures, a court must examine the procedures employed in light of the particular facts of the case and the totality of the circumstances."). As a result, the trial court's decision that the photographic "show-up" was required by the circumstances and not unnecessarily suggestive was reasonable and did not contravene clearly established federal law.

Petitioner has failed to show that the trial court's ruling regarding the photographic "show-up" contradicted a governing rule articulated in a Supreme Court decision or deviated from a Supreme Court decision with materially indistinguishable facts.

### B. Line-Up

Respondents also move to dismiss the claim that the line-up used was impermissibly suggestive. In assessing whether a line-up is suggestive, there is no requirement that lineup participants be nearly identical in appearance. "When the appearance of participants in a lineup is

not uniform . . . the principal question in determining suggestiveness is whether the appearance of the accused . . . so stood out . . . as to suggest . . . that that person was more likely to be the culprit." *United States v. Wong*, 40 F.3d 1347, 1359-60 (2d Cir. 1994). "A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." *Raheem v. Kelly*, 257 F.3d 122, 134 (2d Cir. 2001).

Petitioner argues the police constructed a lineup that was impermissibly suggestive because it closely conformed to the individual that the victim had identified from the photograph as her assailant rather than containing individuals who matched the description of the attacker that the victim gave at the scene. (Pet.'s Opp. Mem. at 28-29.) Thus, according to Petitioner, the line-up identification was tainted by the purportedly impermissible photo display and should thus be excluded.

Considering the line-up photographs, the individuals in the line-ups were substantially similar in appearance, all had facial hair, and all can be described as "black males." (*See* Pet.'s Appellant Brief, App. at 25, 26.) From these photographs, Petitioner does not "stand out" any more or any less than the other members. As Petitioner admits, the police used persons in the line-ups "who matched the Petitioner as displayed in photographs." (Pet.'s Opp'n Mem. at 28.) Nor can the line-up identification be considered fruit of the poisonous tree, where as here, the use of the photographic show-up was not impermissible.

In sum, the photographic "show-up" and the constitution of the line-ups were not "impermissibly suggestive."

**V.     Trial Court Ruling that Closing Statements Did Not Shift Burden of Proof**

Respondents challenges Petitioner's assertion that the prosecutor's summation impermissibly shifted the burden of proof.  (*See* Resps.' Mem. at 30.)  This is in response to Petitioner's assertion that the prosecutor improperly vouched for the credibility of the complainant and switched the burden of proof to Petitioner.  (*See* Pet.'s Opp'n Mem. at 31.)

In reviewing whether the prosecutor's remarks violated the Fourteenth Amendment, the Supreme Court has stated that "the relevant question is whether the prosecutor's comments 'so infected the trail with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  In order to grant relief, the Court would have to find that the prosecutor's comments during summation constituted more than mere trial error, and were instead so egregious as to violate Petitioner's due process rights.  *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974); *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998); *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990) ("The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.") (internal quotation marks and citations omitted).

To be entitled to relief, Petitioner must first show that the relevant comments were "improper" and then "that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 823 (2d Cir.1994) (internal quotation marks and citation omitted); *see also Tankleff*, 135 F.3d at 252.  In deciding whether Petitioner suffered "actual prejudice" as a result of the prosecutorial misconduct, the Court considers "[1] the severity of the misconduct;

[2] the measures adopted to cure the misconduct; and [3] the certainty of conviction absent the improper statements." *Floyd*, 907 F.2d at 355; *see also Tankleff*, 135 F.3d at 252.

> The remarks at issue occurred during closing arguments. The prosecutor said to the jury:
>
> I think if you give this evidence some look, scrutinize it, and say to yourself, what points away from Darryl Layton? Nothing. Nothing. It all supports Miss Vici as credible, truthful in her presentation. A person you can trust. A person you can rely on. All the evidence, every shred of it, points to Mr. Layton and it does so for only one reason.

Petitioner argues that the above remarks were prejudicial because they "were the culmination of all of [the other] errors and cannot be viewed in a vacuum"; because the prosecution's comment that all of the evidence "supports" the complainant's testimony "was clearly untrue, and of considerable effect, when he knew of the $3 million lawsuit"; and because the statement "improperly shifted the burden of proof and implied that the Petitioner should have testified himself" by "implying that the Petitioner did not offer his own testimony pointing it away from himself." (Pet.'s Opp. Mem. at 32-33.)

Prosecutorial misconduct cannot give rise to a constitutional claim unless the prosecutor's acts constitute "egregious misconduct." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48 (1974); *see also Miranda v. Bennett*, 322 F.3d 171, 180 (2d Cir. 2003). In order to determine whether relief is warranted, prosecutorial misconduct must be assessed "in the context of the entire trial." *See Miranda*, 322 F.3d at 180.

The Court has already found that there were no other errors sufficient to warrant habeas relief. The prosecutor's summation was not the culmination of other errors. Finally, the suggestion that the prosecution implied anything about the Petitioner's failure to testify is too attenuated to warrant a finding of misconduct. The prosecution did not make any direct reference

to the fact that Petitioner had failed to testify: he was merely stating that the evidence supported a guilty verdict. "A prosecutor is not precluded from vigorous advocacy . . . in summation." *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992); *see also United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir. 1995). To find that the prosecutor's comments constituted "misconduct" would unduly restrict his ability to vigorously advocate his position. As a result, the prosecutor's comments do not constitute misconduct, and the habeas petition must be denied.

Assuming *arguendo* that the prosecutor's comments did constitute misconduct, there is no showing of "actual prejudice" that would warrant setting aside the trial court's verdict. As to the first factor under "actual prejudice"–whether the misconduct was severe–the prosecutor addressed the victim's credibility, but he did so in response to defense counsel's summation, wherein she repeatedly challenged the victim's credibility. The prosecution is entitled to rebut arguments raised during the defense summation, "'even to the extent of permitting the prosecutor to inject his view of the facts to counter the defense counsel's view of the facts.'" *Readdon v. Senkowski*, 1998 WL 720682, *4 (S.D.N.Y. 1998) (quoting *Orr v. Schaeffer*, 460 F. Supp. 964, 967 (S.D.N.Y. 1978)). "Where a prosecutor's statement is responsive to comments made by defense counsel, the prejudicial effect of such objectionable statements is diminished." *Pilgrim v. Keane*, 2000 WL 1772653, *3 (E.D.N.Y. Nov. 15, 2000). *Cf. United States v. Matthews*, 20 F.3d 538, 552 (2d Cir. 1994) (holding that while a given argument would be impermissible during summation if the prosecution had raised the matter on its own, "such comment may be permissible when the defendant, by the impression he has sought to create, has opened the door"). Furthermore, this is the only comment that Petitioner cites to as potentially improper: one paragraph in the entire trial. *Cf. United States v. Nersesian*, 824 F.2d 1294, 1329 (2d Cir.

1987) (characterizing remark as "a minor aberration in a prolonged trial").  Thus, even if there

had been misconduct, it was not severe.

Furthermore, it is undisputed that the trial court charged the jury on reasonable doubt, the

prosecution's never shifting burden to prove the defendant's guilt beyond a reasonable doubt,

that the defendant is presumed innocent until proven guilty, and that the defendant has no duty to

call any witnesses or to take the stand.  These instructions were adequate to cure any of the

claimed errors in the prosecution's summation.

In sum, this ground advanced by the Petitioner, like the others already discussed, is

insufficient to warrant the relief requested.

**VI.**    **Voir Dire Procedure**

Finally, Petitioner argues that by summarily excusing a number of jurors, the trial court

violated his right to a jury that represents a fair cross-section of the community.

At the commencement of jury selection, after some preliminary instructions, the Court

charged the prospective jurors as follow:

> I anticipate that some of you will have personal circumstances that
> make it impossible for you to devote the time and attention to
> which the litigants are entitled.
>
> Another concern would be anyone who has health problems or
> trouble with the English language or has good reason to be unable
> to remain serving as a juror on this matter until its conclusion.
> In a moment, I shall allow all of you who have concluded for the
> reasons which I have just outlined or any other reason that you feel
> is adequate to excuse yourselves and return to the central jury room
> for possible service on another panel.
>
> But before you excuse yourself, I ask you to be mindful that our
> courts rely upon citizens such as you to take the time from busy
> schedules to sit as jurors.  Clearly, our system of justice could not

exist without people like you who recognize the important duty
you were called upon to perform.

Therefore, I ask that if you decide that you do not want to sit on
this case, that your decision be based upon an inconvenience that
would be unfair to ask any citizen to endure in a similar situation
or if there's a conflict for one of the other reasons I have just
proposed.

Now, let me make clear. I'm going to allow, in a minute, anyone
that doesn't want to sit on this jury panel for scheduling reasons, or
health reasons or whatever reasons you got to leave, get your card
back and go back down to the central jury room. In other words,
I'm not going to be asking for excuses. if you want to go, that's
going to be up to you.

But what I want to avoid is, please, later on, after I've given you
this chance and you've had your chance to go, don't come back and
start to tell me about reasons why you can't stay because I'm
telling you, you don't have to tell me that. All you got to do is go.

With all these things in mind, if you have determined that you
cannot sit on this case for any reason, you should go out in the hall
and get your juror card from the court officers and return to the
central jury room.

[Trial Tr. 35-38]

Petitioner failed to raise any objection to the trial court's screening process upon its

implementation and corresponding release of prospective jurors. Moreover, no objection was

voiced by Petitioner when the Court, at the end of the day, asked if there were any applications

by anyone. [Trial Tr. 146.] By failing to raise a contemporaneous objection when the trial court

could have considered and conceivably cured the alleged infirmity, defense counsel failed to

comply with C.P.L. § 470.05(2). *See Rodriguez v. Schriver* 392 F.3d 505, 510 (2d Cir. 2004);

*see also Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir. 1999) ("[W]e have observed and deferred to

New York's consistent application of its contemporaneous objection rules."). Accordingly, any complaints about the trial court's screening process were not preserved for habeas review.

The Court further notes that Petitioner does not cite to any Supreme Court opinions or clearly established federal law to support his position. Indeed, the one citation that might provide some support for Petitioner's position is a dissenting opinion by Justice Frankfurter in *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). (*See* Pet.'s Opp. Mem. at 36.) Rather, the general rule is that "[t]he trial court has ample discretion to determine how best to conduct voir dire." *United States v. Yousef*, 327 F.3d 56, 118 (2d Cir. 2003). While the procedure adopted by the trial court may be problematic - with the only arguable benefit being an acceleration of the jury selection process - there is nothing to indicate that the selected jury in this case was constitutionally flawed. As correctly noted by Respondents:

> [Petitioner's] contention that the court "relieved potential jurors who were more likely representative of the community than those who remained" is a wholly unsupported claim.
> That many of the potential jurors remaining on the panel were acquainted with members of law enforcement, or were the victim of crime does not mean that they do not represent a cross-section of the community either in terms of ethnicity, religion, gender, sexual orientation, socio-economic status, [] culturally [or otherwise]. His further assertion, that there were an "unusually high number" of potential jurors who had close ties to law enforcement is similarly unsupported. Moreover, even if this were so, there is absolutely no evidence that this was the result - either directly or indirectly [-of the manner by which] the court exempt[ed] potential jurors from service.

Respondents' Mem. in Supp. of Mot. to Dismiss at 42.

In sum, Petitioner failed (1) to make a contemporaneous objection to the procedure now challenged, (2) to demonstrate that the procedure violated clearly established federal law and, in any event, (3) that he was prejudiced thereby.

### *Conclusion*

For the foregoing reasons, Respondents' motion is GRANTED and the habeas petition is DENIED in its entirety.  The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, N.Y.                    /s/_____
       February 13, 2008                    Denis R. Hurley,
                                        Senior United States District Judge